UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LARRY GLOVER<br>    104 King Arthur Street<br>    Victoria, TX<br><br>    *Plaintiff*<br><br>  v.<br><br>JERNIGAN CAPITAL, INC.<br>    c/o CSC-Lawyers Incorporating<br>    Service Company<br>    7 St. Paul Street<br>    Suite 820<br>    Baltimore MD 21202<br><br>JOHN A. GOOD<br>    c/o Jernigan Capital, Inc.<br>    c/o CSC-Lawyers Incorporating<br>    Service Company<br>    7 St. Paul Street<br>    Suite 820<br>    Baltimore MD 21202<br><br>MARK O. DECKER<br>    c/o Jernigan Capital, Inc.<br>    c/o CSC-Lawyers Incorporating<br>    Service Company<br>    7 St. Paul Street<br>    Suite 820<br>    Baltimore MD 21202<br><br>JAMES DONDERO<br>    c/o Jernigan Capital, Inc.<br>    c/o CSC-Lawyers Incorporating<br>    Service Company<br>    7 St. Paul Street<br>    Suite 820<br>    Baltimore MD 21202<br><br>HOWARD A. SILVER<br>    c/o Jernigan Capital, Inc.<br>    c/o CSC-Lawyers Incorporating<br>    Service Company | Case No.:<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

> 7 St. Paul Street
> Suite 820
> Baltimore MD 21202
>
> HARRY J. THIE
>     c/o Jernigan Capital, Inc.
>     c/o CSC-Lawyers Incorporating
>     Service Company
>     7 St. Paul Street
>     Suite 820
>     Baltimore MD 21202
>
> REBECCA OWEN
>     c/o Jernigan Capital, Inc.
>     c/o CSC-Lawyers Incorporating
>     Service Company
>     7 St. Paul Street
>     Suite 820
>     Baltimore MD 21202
>
>         *Defendants*.

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Larry Glover ("Plaintiff"), by his undersigned attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### INTRODUCTION

1. Plaintiff brings this action against Jernigan Capital, Inc. ("Jernigan" or the "Company") and the Company's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a). Specifically, Defendants solicit stockholder approval in connection with the proposed acquisition of the Company by affiliates of NexPoint Advisors, L.P. ("NexPoint"), through a proxy statement filed with the U.S. Securities and Exchange Commission (the "SEC"), that omits material facts necessary to make the statements therein not false or misleading.

2. On August 3, 2020, Jernigan and NextPoint issued a press release announcing that the two entities had entered into a definitive agreement (the "Merger Agreement"), pursuant to which Jernigan stockholders will receive $17.30 in cash for each share of Jernigan common stock they own ("The Proposed Transaction"). On August 20, 2020, defendants issued materially incomplete and misleading disclosures in a proxy statement (the "Proxy Statement") filed with the SEC in connection with the Proposed Transaction. Specifically, the Proxy Statement is materially deficient and misleading because, *inter alia*, it omits material information concerning: (i) the Company's financial projections and the material information regarding the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, Jefferies LLC ("Jefferies"); (ii) Jefferies' conflicts of interest; and (iii) the sale process. Without this information, Jernigan stockholders cannot make an informed decision with respect to the Proposed Transaction. The omission of such material information renders the Proxy Statement materially misleading and constitutes a violation of §§ 14(a) and 20(a) of the Exchange Act.

3. For these reasons, as set forth in detail herein, the Individual Defendants, and the Company, have violated the federal securities laws. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder

5. Personal jurisdiction exists over each Defendant either because Defendant Jernigan is incorporated and maintains operations in this District, or because each of the other Defendants

is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

6. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Jernigan is incorporated in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

7. Plaintiff is, and has been at all relevant times, the owner of shares of Jernigan common stock.

8. Defendant John A. Good ("Good") is Chief Executive Officer and Chairman of the Board of the Company.

9. Defendant Mark O. Decker ("Decker") is a director of the Company. He has served as a director of Jernigan since 2015.

10. Defendant James Dondero ("Dondero") is a director of the Company. In addition to his position on the Board, Dondero is also the founder and President of NexPoint Advisors.

11. Defendant Howard A. Silver ("Silver") has served as a director of Jernigan since 2015.

12. Defendant Harry J. Thie ("Thie") has served as a director of Jernigan since 2015.

13. Defendant Rebecca Owen ("Owen") is, and has been at all relevant times, a director of Jernigan 2018.

14. Defendants Owen, Thie, Silver, Dondero, Decker, and Good are collectively referred to as "Individual Defendants" and/or the "Board."

15. Defendant Jernigan, incorporated in Maryland, is a commercial real estate company that invests primarily in new or recently constructed and opened self-storage facilities located predominately in dense urban submarkets within the top-50 United States Metropolitan Statistical Areas, or MSAs. The Company's common stock is traded on New York Stock Exchange under the ticker symbol "JCAP." The Company maintains its principal executive offices at 6410 Poplar Avenue, Suite 650, Memphis, Tennessee 38119.

16. The Individual Defendants and Jernigan are collectively referred to as "Defendants."

## FURTHER SUBSTANTIVE ALLEGATIONS

**The Background of the Company & Merger**

17. On December 31, 2019, the Company announced that Dean Jernigan, the Company's founder and then-executive chairman, would retire as director, and Mr. Good would assume the role of chairman. Almost immediately following the appointment of Mr. Good, the Company began an aggressive search for a strategic transaction.

18. That next month, during a multi-day industry event in Deer Valley, Utah, Mr. Good met separately with representatives for two REITs operating in the self-storage industry ("Party A" and "Party B") concerning the possibility of a strategic transaction, but the parties did not discuss valuation, a potential exchange ratio or purchase price or any other specific terms.

19. Later that same month, on January 24, 2020, Mr. Good met in Dallas with Matt McGraner, the chief investment officer of NexPoint Real Estate Advisors, L.P., ("NexPoint") an affiliate of the holders of the Company's Series A Preferred Stock, to discuss the Company's performance and the status of its investment portfolio, as well as strategies with respect to the ultimate redemption of the Company's Series A Preferred Stock. During this discussion, Mr. McGraner indicated that in lieu of a redemption of the Series A Preferred Stock and cessation of

NexPoint's investment in the Company, NexPoint may be interested in submitting a proposal to acquire the Company in a potential go-private transaction.

20. On January 28, 2020, Mr. Good and a representative from Jefferies, which had previously provided financial advisory services to the Company, met representatives of Party A to further discuss a proposed transaction.

21. On February 20, 2020, the Company's Board engaged King & Spalding as legal counsel and formally engaged Jefferies as the Company's financial advisor in connection with its exploration of potential business combination transactions.

22. On March 4, 2020, Mr. Good and the chief executive officer of Party B met in Atlanta. During the meeting, Mr. Good and the chief executive officer of Party B discussed the strategic vision for the Company's lending business, certain personnel matters, respective overhead levels and potential buyouts of developers. Mr. Good and the chief executive officer of Party B also discussed the functions of the companies' respective senior management teams but did not discuss the roles or compensation, if any, of management following the closing of any negotiated transaction.

23. Approximately one week later, the executive chairman of Party A called Mr. Good to communicate that the Party A affiliate was continuing to acquire Company common shares and was likely to exceed 5% ownership of the Company's outstanding shares of common stock, necessitating a filing under Section 13 of the Exchange Act, but that Party A intended to remain a passive investor.

24. On March 24, 2020, the chief executive officer of Party B called Mr. Good to communicate that because of the dramatic and abrupt changes in the United States' economic climate and Party B's stock price due to the onset of the COVID-19 pandemic, Party B was

suspending its due diligence activities with respect to a potential strategic business combination with the Company. Following this conversation, discussions and due diligence efforts between the parties terminated without any discussion of an exchange ratio or potential purchase price.

25. On March 25, 2020, senior executives of a REIT operating in the self-storage industry, "Party C", contacted Mr. Good to explore whether there were any strategic opportunities that Party C and the Company could potentially pursue together. Follow-up discussions with Party C were held on May 1, 2020.

26. Between May 4, 2020 and May 6, 2020, representatives of the Company received an unsolicited inquiry from a representative of a sizeable financial institution, Party D, inquiring about the Company and indicating potential interest in some form of strategic transaction, most likely in the form of an equity infusion.

27. On May 7, 2020, the Company's board of directors held a telephonic meeting. Mr. Good informed the board of directors of his discussions to date with representatives of Party C, Party D, and Party A. That same day, Matt McGraner of NexPoint contacted Mr. Good by telephone to inform him that NexPoint had been evaluating a potential all-cash acquisition of the Company and intended to deliver a written proposal in the next few days.

28. On May 11, 2020, Mr. Good received a non-binding letter of intent from NexPoint with a proposal to acquire 100% of the Company's outstanding common stock and operating company units in an all cash merger transaction with a purchase price range of $17 to $18 per share. The non-binding proposal included a draft exclusivity agreement pursuant to which the parties would negotiate exclusively regarding a potential transaction for 45 days.

29. On May 12, 2020, the board of directors held a special telephonic meeting during which it discussed, among other matters, the status of the discussions to date with representatives

of NexPoint, Party C, Party D, and Party A. Given that NexPoint had submitted a proposal and its affiliate, as the Series A Preferred stockholder, had elected a director to the Company's board (James Dondero), the board of directors, cognizant of avoiding any potential conflict of interest, unanimously approved the formation of a transaction committee of all the members of the board of directors other than Mr. Dondero, which we refer to as the Transaction Committee. The Transaction Committee was comprised of Mr. Good, Mark Decker, Howard Silver, Harry Thie and Rebecca Owen, and was authorized to consider whether to pursue a strategic transaction with NexPoint or other potential parties and to report its recommendation concerning any potential transaction to the Company's board of directors for approval.

30. On May 14, 2020, the Company and Party C entered into a non-disclosure agreement, and Party C and its legal and financial advisors subsequently received access to the Company's virtual data room and commenced their diligence investigation.

31. That same day, Mr. Good called the executive chairman of Party A and informed him that the Company would be willing to enter into a mutual non-disclosure agreement with Party A in order to facilitate further discussions regarding a potential transaction between the parties, after which Mr. Good delivered to the executive chairman of Party A a draft mutual non-disclosure agreement.

32. On May 21, 2020, the Company and Party A executed a non-disclosure agreement, and Party A and its legal and financial advisors received access to the virtual data room.

33. On May 27, 2020, the Company and NexPoint entered into a non-disclosure agreement, and NexPoint and its legal and financial advisors received access to the virtual data room.

34. On June 15, 2020, NexPoint submitted a revised non-binding letter of intent to acquire for cash all of the Company's outstanding common stock and operating company units with a purchase price range of $17.00 to $17.50 per share.

35. The following day, on June 16, 2020, the executive chairman of Party A informed Mr. Good that Party A would not be willing to offer more than $14.50 per share of the Company's common stock. On June 16, 2020, the closing price of the Company's common stock on the NYSE was $14.75. Mr. Good and the executive chairman of Party A agreed the indicated price level did not warrant further discussion of a proposed transaction between the Company and Party A at that time.

36. On June 19, 2020, the Company delivered to NexPoint a written response to NexPoint's revised nonbinding letter of intent.

37. That same day, a senior executive of Party C contacted Mr. Good to inform him that the proposed exchange ratio that Party C was likely to propose would be significantly below the maximum exchange ratio previously discussed between representatives of the two entities. Mr. Good and the Party C representative agreed to schedule a call between the parties' representatives to discuss Party C's potential proposal, but Mr. Good noted that any exchange ratio below the maximum level previously indicated by Party C would be unacceptable to the board of directors.

38. Later in June, Mr. Good held talks with two other potential merger partners, "Party F" and "Party G", regarding a potential business combination.

39. On June 24, 2020, the Company and Party D entered into a non-disclosure agreement. However, the Company and its advisors did not provide Party D with access to the virtual data room at that time due to the Company's ongoing discussions with Party C and

NexPoint and the continued activity by each of Party C, NexPoint and their respective advisors in the virtual data room.

40.     Two days later, on June 26, 2020, Party C communicated to Mr. Good that it was no longer interested in pursuing a transaction at that time.

41.     On June 29, 2020, the Transaction Committee held a telephonic meeting during which it discussed the status of discussions with interested parties regarding a strategic transaction, discussions with Party D and Party G regarding a potential capital investment in the Company, and the strategic options available to the Company, including continuing its business as a standalone public REIT. After deliberation, the Transaction Committee determined to proceed with negotiations with NexPoint and approved granting exclusivity to negotiate a potential transaction with NexPoint. The following day, on June 30, 2020, the Company and NexPoint executed an exclusivity agreement pursuant to which the parties agreed to negotiate on an exclusive basis until July 30, 2020. Following the execution of the exclusivity agreement, the parties worked to finalize the terms of the proposed transaction.

42.     On the evening of August 2, 2020, the Transaction Committee held a telephonic meeting to consider the proposed transaction. Following discussion, the Transaction Committee unanimously resolved to recommend the merger agreement and the transactions contemplated by the merger agreement to the board of directors. Immediately following this approval, a telephonic meeting of the full Company board of directors was convened. During the meeting, representatives of Jefferies delivered to the board of directors an oral opinion, which was subsequently confirmed by delivery of a written opinion, dated August 2, 2020, to the effect that the merger consideration to be received by holders of the Company's common stock was fair, from a financial point of view, to such holders. Following these presentations and discussions and receipt of the recommendation

of the Transaction Committee, the Company board of directors unanimously: (a) approved and declared advisable and in the best interests of the Company and the Company's stockholders the merger, the merger agreement and the other transactions contemplated by the merger agreement; and (b) resolved to recommend that the Company stockholders vote to approve the merger and the other transactions contemplated by the merger agreement.

**Proposed Transaction**

43. In a press release dated August 3, 2020 Jernigan announced that it had entered into the Merger Agreement.

44. The press release states in pertinent part:

> MEMPHIS, Tenn.--(BUSINESS WIRE)--Jernigan Capital, Inc. (NYSE: JCAP) ("JCAP" or the "Company"), an owner of self-storage facilities and a leading capital partner for self-storage entrepreneurs nationwide, today announced that it has entered into a definitive merger agreement with an affiliate of NexPoint Advisors, L.P. (together "NexPoint") under which it will be acquired by NexPoint in an all-cash transaction valued at approximately $900 million, including debt and preferred stock to be assumed or refinanced (the "Merger Agreement"). The agreement has been unanimously approved by the Company's Board of Directors. The transaction was recommended to the Company's Board of Directors by a Transaction Committee consisting of all directors (other than Jim Dondero, founder and President of NexPoint) established to evaluate the transaction.
>
> Under the terms of the Merger Agreement, holders of JCAP's common stock and holders of units of operating company interests in Jernigan Capital Operating Company, LLC will receive $17.30 per share/unit in cash. This represents a 30% premium over the 90-day volume-weighted average share price ending July 31, 2020 and a 23% premium over the July 31, 2020 closing share price. Holders of the Company's Series B preferred stock will receive cash equal to $25.00 per share plus all accrued dividends (whether or not authorized or declared) up to, but excluding, the date the merger is consummated.
>
> "Since our initial public offering in March of 2015, we have built from the ground up a best in class portfolio of newly constructed Generation V self-storage facilities in some of the best submarkets in the United States, along with a development platform that is the first of its kind in our sector," said John Good, JCAP's Chief Executive Officer and Chairman. "We believe this transaction with NexPoint validates the quality of the portfolio of self-storage properties and the corporate platform we have built and accomplishes the goal of maximizing value

for our stockholders during a very difficult time for all of us. We are certain today's announcement is in the best interests of all of JCAP's stakeholders."

"NexPoint has long admired and supported Jernigan Capital's unique self-storage business model and platform," added Jim Dondero, NexPoint's founder and President. "We plan to build on this vision as a private company, maintaining unparalleled asset quality and continuing the current growth trajectory. With our combined expertise, scale and financial strength, we are well positioned to execute this vision and further expand the Company's national footprint."

The transaction, which is currently expected to close in the fourth quarter of 2020, is subject to customary closing conditions, including the approval of JCAP's stockholders, who will vote on the transaction at a special meeting on a date to be announced. The transaction is not contingent on receipt of financing by NexPoint.

**The Proxy Statement Misleads Jernigan Stockholders by Omitting Material Information**

45. On August 20, 2020, Jernigan caused to be filed the Proxy Statement with the SEC. As alleged below and elsewhere herein, the Proxy Statement contains material misrepresentations and omissions of fact that must be cured to allow Jernigan's stockholders to render a properly informed decision with respect to the Proposed Transaction. Designed to convince shareholders to vote in favor of the Proposed Transaction, the Proxy Statement is rendered misleading by the omission of critical information concerning the financial analyses performed by the Company's financial advisors, and other crucial issues. This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to Jernigan stockholders.

*Material Omissions Concerning Management's Financial Projections and the Financial Advisor's Respective Financial Analyses*

46. With respect to the financial projections disclosed in the Proxy Statement, the Proxy Statement fails to disclose: (i) all line items used to calculate (a) owned net operating income, (b) EBITDA, (c) unlevered free cash flow, and (d) funds from operations; and (ii) a reconciliation of all non-GAAP to GAAP metrics. In addition to these material omissions, the description in the

12

Proxy Statement of the financial advisors' respective fairness opinions and the underlying analyses omits key inputs and assumptions used by the financial advisors that underlie their respective analyses.

47. With respect to Jeffries' Selected Public Company Analysis, the Proxy Statement fails to disclose the individual multiples and metrics for the companies observed and applied in the analysis.

48. With respect to Jeffries' Selected Precedent Transactions Analysis, the Proxy Statement fails to disclose the individual multiples and metrics for the transactions observed and applied in the analysis.

49. With respect to Jefferies' Net Asset Value Analysis, the Proxy Statement fails to disclose: (i) cash flow for owned properties and development investments as used in the analysis and all underlying line items; (ii) projected fair value of development investments as used in the analysis; (iii) the terminal values used in the analysis; (iv) Jefferies' basis for applying a range of exit capitalization rates of 5.1% to 5.5%; and (v) the individual inputs and assumptions underlying the discount rates of 9.5% to 10.8%.

50. With respect to Jefferies' Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) all line items used to calculate unlevered free cash flows; (ii) the individual inputs and assumptions underlying the discount rates ranging from 9.5% to 10.8%; and (iii) total debt, preferred equity, cash, and cash equivalents as used in the analysis.

51. Finally, with respect to Jefferies' analysis of premiums paid, the Proxy Statement fails to disclose: (i) the transactions observed in the analysis; and (ii) the premiums paid in the transactions.

52. When a bankers' endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best basis to project the future financial performance of a company and allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material and must be disclosed if Jernigan stockholders are to make a fully informed decision. The omission of this information renders the statements made concerning the financial advisors' analyses and opinions materially misleading.

53. Without such undisclosed information, Jernigan stockholders cannot evaluate for themselves whether the financial analyses performed by the financial advisor were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can evaluate the extent to which financial advisor's opinion and analyses should factor into their decision whether to tender their shares or pursue their appraisal rights. This information is necessary because, as the Proxy Statement reveals, a full disclosure of investment banker compensation and all potential conflicts is not provided in the Proxy Statement.

54. The omission of this information renders certain portions of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act including, inter alia, the following sections of the Proxy Statement: (i) "Opinion of our Financial Advisor" and "Forward-Looking Financial Information."

*Material Omissions Concerning Potential Conflicts of Interest*

55. In describing financial advisory or other services to Jernigan for which it received compensation, the Proxy Statement notes that that in the two years preceding the date of the fairness opinion letter, Jefferies has, in the past, provided financial advisory and financing services to the Company and has received fees for such services.

56. However, with regard to the past work that Jefferies has performed over the past two years, the Proxy Statement fails to disclose the fees that Jefferies has received for this work, and further fails to disclose the precise nature of the work that was performed. SEC regulations require the full disclosure of investment banker compensation and all potential conflicts due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives. Here, the Proxy Statement omits material information concerning Jefferies potential motivations for recommending that the Merger Consideration is fair to Jernigan stockholders. This omission renders the Proxy Statement not only materially incomplete, but materially misleading. Without this information, there is a concern that the prior relationship between Jefferies and the Company may have enabled the Company to push Jefferies to support a sale of the Company and influence the financial analyses provided to the Board.

57. Accordingly, without full disclosure of the exact nature of the work done by Jefferies for the Company in the last two years, and the fees received for such work, Jernigan stockholders will be materially misled as to Jefferies's potential conflicts of interest.

*Material Omissions Concerning the Sale Process*

58. With regard to the sale process, the Proxy Statement also omits material information concerning the terms and values of all indications of interest, proposals, and or term sheets between Jernigan and potentially interested counterparties during the 2020 sales process

15

leading up to the Proposed Transaction. Specifically, the Proxy Statement fails to disclose "the maximum exchange ratio per share of the Company common stock that Party C was willing to consider in connection with the potential merger." Accordingly, stockholders are left in the dark as to the value of the alternatives to the Proposed Transaction, and are unable to assess properly the attractiveness of the deal that is before them.

59. Furthermore, the Proxy Statement notes that a number of potential acquirers entered into non-disclosure agreements with Jernigan. However, with regard to the terms of these agreements, the Proxy Statement fails to note whether these non-disclosure agreements contained standstill and/or "don't ask, don't waive" provisions ("DADW") that are or were preventing other potential acquirors from submitting offers to acquire the Company. Any reasonable stockholder would deem the fact that likely bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

60. Without disclosure of all of the material facts, the Company's stockholders may be lured into approving a Proposed Transaction that is designed to benefit management rather than the stockholders.

61. Defendants are, and have at all relevant times been, in full possession of the undisclosed facts, and have negligently, recklessly, knowingly and/or intentionally omitted this information from the Proxy Statement.

62. Without disclosure of the above referenced information, the Proxy Statement violates SEC regulations and materially misleads Jernigan stockholders. Accordingly, Plaintiff seeks, among other things, the following relief: (i) an injunction of the Proposed Transaction; (ii) rescission of the Proposed Transaction if it is consummated; and (iii) rescissory or other appropriate damages resulting from Defendants' misconduct.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

63. Plaintiff repeats and realleges each allegation set forth herein.

64. As detailed herein, Defendants disseminated the false and misleading Proxy Statement specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

65. Using the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common stock of Jernigan.

66. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by Defendants. The Proxy Statement misrepresented and omitted material facts, including material information concerning the actual intrinsic value of the Company. Defendants were at least negligent in filing and disseminating the Proxy Statement with these materially false and misleading statements and omissions. Defendants have also failed to correct the Proxy Statement and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

67. The omissions, and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

68. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

69. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

70. The Individual Defendants acted as controlling persons of Jernigan within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of Jernigan and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

71. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

72. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

73. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

74. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and against Defendants as follows:

a) declaring that the Proxy Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b) preliminarily and permanently, enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

c) to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest;

d) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

e) granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 14, 2020

**LEVI & KORSINSKY LLP**

*/s/ Donald J. Enright*
Donald J. Enright
1101 30th Street, N.W., Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: denright@zlk.com

*Attorneys for Plaintiff*